# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:18-cr-113 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| PATRICIA MARIE MULLINS (1), | : | |
| DARRELL JONES (2), | : | |
| DUSTIN JAMES VANWEY (3), | : | |
| ROGER ANTHONY BRASSFIELD (4) | : | |
| | : | |
| Defendants. | : | |

---

**ENTRY AND ORDER GRANTING DEFENDANT PATRICIA MULLINS' MOTION TO SUPPRESS EVIDENCE & STATEMENTS (DOC. 37), DENYING DEFENDANT DARRELL JONES' MOTION TO SUPPRESS (DOCS. 32 AND 46), GRANTING DEFENDANT DUSTIN VANWEY'S MOTION TO SUPPRESS DEFENDANT'S EVIDENCE (DOCS. 43 AND 51), AND DENYING DEFENDANT ROGER BRASSFIELD'S MOTION TO SUPPRESS (DOC. 44)**

---

This case is before the Court on several motions to suppress:

- "Motion to Suppress Evidence & Statements; Request for Hearing" filed by Defendant Patricia Marie Mullins ("Mullins") (Doc. 37);

- "Motion to Suppress" and "Supplement to Motion to Suppress" filed by Defendant Darrell Jones ("Jones") (Docs. 32 and 46);

- "Motion to Suppress Defendant's Evidence" and "Motion of Defendant, Dustin James Vanwey, to Modify Motion to Suppress" filed by Defendant Dustin James Vanwey ("Vanwey") (Docs. 43 and 51); and

- "Motion to Suppress Search and Seizure of items found in the Automobile, Search Warrant regarding the Property (Camper) *Franks Hearing*, [and] Arrest of Defendant" filed by Defendant Roger Anthony Brassfield ("Brassfield") (Doc. 44).

The Court held joint evidentiary hearings for the above-referenced motions to suppress on January 25, March 27, April 8, and May 6, 2019. (Docs. 56, 62, 67, 72.) On June 24, 2019, each of the defendants filed a post-hearing brief in support of his or her motion to suppress.[1] (Docs. 74, 75, 76, 77.) On June 28, 2019, the Government filed a post-hearing brief in opposition to all of the above-referenced motions to suppress and post-hearing briefs filed in support of those motions to suppress. (Doc. 78.) On July 24 or 25, 2019, Brassfield, Vanwey, and Mullins each filed a reply brief in response to the Government's post-hearing brief.[2] (Docs. 79, 80, 81.) The matter is ripe for review.

As an initial matter, the Court notes that Mullins, Vanwey, and Brassfield each moved, within his or her motion to suppress or post-hearing brief, to join the post-hearing briefs in support of their co-defendants' motions to suppress. (Doc. 51 at PAGEID # 238; Doc. 74 at PAGEID # 642; Doc. 77 at PAGEID # 687-88.) In support, these defendants argue, for example, that they share similar issues relative to law enforcement's searches/seizures and that they are charged together with conspiracy, as set forth more fully below. (*See* Doc. 74 at PAGEID # 642; Doc. 77 at PAGEID # 687-88.) There is no indication that the Government objects to these requests. The Court grants the requests to join and analyzes the briefing accordingly.

For the reasons below, the Court determines the following:

Mullins' motion (Doc. 37) is **GRANTED**.

Jones' motions (Docs. 32 and 46) are **DENIED**.

Vanweys' motions (Docs. 43 and 51) are **GRANTED**.

Brassfield's motion (Doc. 44) is **DENIED**.

---

[1] In his Suppression Hearing Brief, Jones "abandon[ed]" his "Supplement to Motion to Suppress" (Doc. 46). (*See* Doc. 75 at PAGEID # 651-52.) Therefore, this Court denies Jones' "Supplement to Motion to Suppress" (Doc. 46) as withdrawn and moot.

[2] Jones did not file a reply brief in response to the Government's post-hearing brief.

# I.    FACTUAL FINDINGS

The following findings are made based on the evidence submitted by the parties and the testimony at the January 25, March 27, April 8, and May 6, 2019 hearings for the various motions to suppress.

On the morning of Saturday, July 28, 2018, Montgomery County Deputy Sheriff Matthew Snyder ("Deputy Snyder") was on patrol in Harrison Township, Ohio looking for a reported stolen Jeep Wrangler that had fled from law enforcement.  At approximately 11:00 a.m., he observed a silver Chrysler 300 automobile (the "Vehicle"), which lacked a front license plate, parked on the wrong side of a public street in front of 5407 Edgewater Drive.  He also observed a man (later identified as Jones) sitting in the front passenger seat of the Vehicle smoking what appeared to Deputy Snyder to be "a one-hitter of marijuana."  Based on these observations, Deputy Snyder decided to conduct a traffic stop and approached the Vehicle, which was not running.

As he approached the Vehicle, Deputy Snyder was able to detect the odor of marijuana. He observed Jones sitting in a contorted manner that, to Deputy Snyder, seemed like Jones was trying to conceal something.  Deputy Snyder asked Jones for identification and what he was doing. As he looked into the Vehicle, Deputy Snyder could see what he believed was a firearm magazine between the door and some debris in the seat, as well as a knife under Jones' leg.  Based on concerns for his safety, Deputy Snyder then asked Jones to get out of the Vehicle.  Deputy Snyder saw the "one-hitter" pipe where Jones had been sitting, as well as a plastic container that appeared to have methamphetamine in it.  Deputy Snyder put Jones, unhandcuffed, in the back of his patrol vehicle.

Deputy Snyder called for additional law enforcement officers to come to the scene, and he went back to the Vehicle to complete a search of its passenger area.  He found and removed a black

bag, within which he found what appeared to be fentanyl, mushrooms, LSD, marijuana, and THC gummies. He also found a loaded .45 caliber handgun magazine. Deputy Snyder went back to his patrol vehicle and asked Jones if Jones had a gun. Jones denied that he had a gun, but then volunteered that the gun and "a little bit of ice" were the only things in the Vehicle that belonged to him and that the other items were "Tony's." Jones said that "Tony" was the driver of the Vehicle, that he did not know "Tony's" last name because he had only recently met "Tony," and that "Tony" was somewhere on the property. Deputy Snyder then found a firearm in the Vehicle under some items where Jones' feet had been. The Vehicle was not registered to Jones.

Given what he had found and Jones' statements, Deputy Snyder wanted to find "Tony." Deputy Snyder saw a camper on the property at 5407 Edgewater Drive parked to the side of an unpaved driveway (the "Camper"). The Camper had its awnings out, had an air conditioner running, and was located approximately 50 to 100 feet from the Vehicle. A permanent residence (the "House") was located approximately 50 to 100 feet from the Camper. Deputy Snyder decided to approach the Camper with the aim of locating "Tony." Due to concerns for his safety, before approaching the Camper, Deputy Snyder waited for other deputies to arrive at the scene. Montgomery County Deputy Sheriff Justin Bone ("Deputy Bone") arrived, followed by Deputy Sheriff Jesse Walker ("Deputy Walker"), and later Deputy Sheriff Matt McIntosh ("Deputy McIntosh").

Deputy Snyder and at least one other deputy approached the front of the Camper. Deputy Snyder knocked on the front door, which had an "Open" sign on it. He also tried opening the door, but the door was locked. He could hear people moving inside the Camper. He kept knocking as loudly as he could and announcing his presence and status as a law enforcement officer, but no

one responded or opened the door. Despite Deputy Snyder and other law enforcement sporadically knocking, no one ever responded to the knocking or announcements.

At some point, at least after an initial set of knocking on the Camper's door, Deputy Snyder walked around the Camper and peered through its windows. Deputy Snyder saw a man lying in a fetal position on the floor partially under the dinette in the Camper; the man was not moving or responding. Deputy Synder testified that he thought that, because he had already found drugs in the nearby Vehicle, the man was probably overdosing. Deputy Snyder also testified that he was very concerned; in his mind, this presented a life-or-death emergency situation. However, Deputy Snyder admitted that he could not tell whether or not the man was breathing, whether or not his skin was bluish- or grayish-colored, or whether or not the man was simply hiding from him.

Deputy Snyder and Deputy Walker testified that an ambulance or medic was requested over the radio. Deputy Snyder continued calling out to the man lying on the floor of the Camper, but he did not receive a response. At some point, Deputy McIntosh arrived and provided a crowbar, which was used by Deputies Snyder and Bone to pry the door open and enter the Camper. It took some time and effort to get the door pried open; Deputy Bone testified that it took about five to seven minutes.

Deputy Snyder has been a deputy sheriff with the Montgomery County Sheriff's Office for over 18-½ years. He estimated that, during his law enforcement career, he has responded to at least 200 drug overdose cases and at least 10 drug overdose death situations. He also received training in the use of Narcan. Deputy Bone has been a deputy sheriff with the Montgomery County Sheriff's Office for approximately 14 years. He estimated that, during his law enforcement career, he has responded to at least 100 drug overdose cases and between 10 to 12 drug overdose death situations.

Deputy Snyder testified that, based on his training, the "time window in which action, treatment needs to occur" in suspected drug overdose situations is "immediate" because "you only have a couple minutes before [the suspected overdoser] either stop[s] breathing or die[s]." It is "[a] potential life-and-death situation." (Doc. 62 at PAGEID # 379-80.) However, Deputy Snyder also testified that, according to audio-video from his own police cruiser camera, he had communicated to Deputy Walker prior to 11:29 a.m. that he had seen someone inside the Camper that he suspected had overdosed. (*Id.* at PAGEID # 464-65, 467.) The same audio-video shows that at 11:54 a.m. Deputy Snyder approached his cruiser and said to Jones (who was in Deputy Snyder's cruiser): "Somebody's laying there on the floor and I can't get 'em to move." (Def. Exh. O; Doc. 62 at PAGEID # 460, 465-67, 469.)

This indicates that at least 25 minutes elapsed between Deputy Snyder seeing the man lying on the floor (who he believed to be overdosing) and forcing entry into the Camper.[3] In fact, Deputy Snyder agreed that the audio-video at 12:03 p.m. includes him saying "We have one female moving, and she won't open the door," indicating at that point—now over 30 minutes since he had communicated to Deputy Walker that he suspected someone had overdosed in the Camper—forced entry still had not been achieved.[4] (Doc. 62 at PAGEID # 479.) During those (at least) 25 minutes, Deputy Snyder and the other deputies are seen on the audio-video rather nonchalantly standing

---

[3] Although Deputy Snyder testified that his recollection was that there were 15 minutes between the first knocking on the Camper's door and when the forced entry was made, Deputy Snyder admitted that the audio-video that came from his cruiser would be a more accurate depiction of the timing of when events occurred than his testimony over eight months later during the evidentiary hearings. (Doc. 67 at PAGEID # 528-29, 548.) Deputy Snyder responded "I don't know" when counsel asked: "[A]t the time that you called dispatch, that would have been – in reference to getting assistance for this person – that would have been almost 30 minutes after you, Deputy Bone, and Deputy Walker were at the [C]amper where you say you first observed this person?" (Doc. 62 at PAGEID # 476.) Similarly, Deputy Walker testified that he did not recall how much time had lapsed between Deputy Snyder alerting him to the man on the floor in the Camper and law enforcement gaining entry into the Camper. (Doc. 56 at PAGEID # 320.) Deputy Bone testified that it was "maybe a half hour" between when he arrived and the forced entry. (Doc. 72 at PAGEID # 601.)

[4] The audio also appears to say at that point: "We got at least one male on the ground but not moving. We can't get her to open the door," further indicating that entry had not yet been gained. (Def. Exh. O.) At 12:06 PM, the audio-video shows a person being brought in handcuffs to a deputy's vehicle. (*Id.*)

around, sitting in a police vehicle, and wandering around (apparently even fetching Jones some cigarettes from the Vehicle so that he could smoke).[5] (*See, e.g.,* Def. Exh. O at timestamp 11:29:00 to 11:38:12.)

Upon gaining entry to the Camper by using a crowbar to pry open its door, the deputies saw that a woman (subsequently identified as "J.B.") was on her hands and knees at the place where the man that Deputy Synder had seen through the window had been. That man was now lying in a bed at the end of the Camper with a dog and two other people: Mullins and Vanwey.[6] The deputies also saw, in plain view, a sawed-off shotgun in the Camper. Deputy Snyder testified that it was obvious someone had been living in the Camper.

Deputy Synder testified that Brassfield was removed from the Camper, Brassfield's "speech wasn't intelligible," and the Harrison Township paramedics—who "had arrived and were waiting"—transported Brassfield to Grandview Medical Center. (Doc. 62 at PAGEID # 403.)

---

[5] The following exchange between counsel and Deputy Snyder also took place during the evidentiary hearings:
"Q: So you look in the [C]amper. You see someone. They are not moving. And you think they could be – have an overdose?
A: Yes, ma'am.
Q: At that point, Deputy Snyder, why didn't you go over to Ed VanWey's [House, the property owner,] and knock on the door?
A: I don't know.
Q: Wouldn't that have been expedient, to get into that [C]amper? Somebody could be overdosing.
A: That would – prying the door open was probably more expedient.
Q: All right. But you couldn't do that right away, right?
A: We were trying, yes.
Q: Well, you were trying some 20 minutes later.
A: Okay.
Q: Right?
A: I don't recall the time, but, yes.
…
Q: Who's the one who brought the pry bar?
A: I believe it was Deputy Walker.
Q: Incidentally, in your cruiser, do you not have a crowbar?
A: I have an SUV, and I can't get to most of my stuff. That's one of the things we don't use very often, so it's buried down in the bottom drawer. So I know I couldn't get to mine expediently."
(Doc. 67 at PAGEID # 515-16.)
[6] Mullins is Vanwey's mother, and Mullins' father (Vanwey's grandfather) is Ed Vanwey, who owns the property at 5407 Edgewater Drive on which the Camper sat.

Prior to being transported to the hospital, Brassfield was patted down by law enforcement, who found on him keys to the Vehicle, an identification card that did not belong to Brassfield, and $2,800 in cash. Between approximately 1:15 p.m. and 2:30 p.m., Jones, Mullins, and Vanwey were each separately advised of his or her *Miranda* rights, acknowledged by signing a "Pre-Interview Form" that contained a waiver of rights. (*See* Govt. Exhs. 14, 15, 16.) Law enforcement then interviewed them.

Subsequent to the initial entry into the Camper referenced above, at approximately 3:00 p.m. on that same day, law enforcement obtained a search warrant for the Camper. (*See* Govt. Exh. 11.) Law enforcement then re-entered the Camper and performed a comprehensive search. This second entry and search resulted in the discovery of, among other things, a variety of illegal narcotics, drug paraphernalia, firearms, and ammunition. (*Id*.) Law enforcement also impounded, inventoried, and towed from the scene both the Vehicle and the Camper. The Vehicle was not owned by either Brassfield or Jones, and a database search indicated that the Camper was stolen. Additionally, law enforcement obtained a search warrant for Jones' cell phone on July 31, 2018. (Govt. Exh. 12.)

On August 28, 2018, the Grand Jury returned a six-count indictment in this case. (Doc. 23.) Count 1 charges each of the defendants with conspiracy to possess with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), and 846. (*Id*.) Count 2 charges Mullins with using and maintaining a place for the purpose of manufacturing, distributing, and using methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 856(a)(1). (*Id*.) Counts 3 and 4 charge Mullins and Vanwey, respectively, with being felons in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

(*Id.*)  Counts 5 and 6 charge Jones and Vanwey with possessing a firearm while being an unlawful user of a controlled substance (methamphetamine), in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2).  (*Id.*)  On September 17, 2018, each of the defendants entered a not guilty plea to each count against him or her.  (Docs. 25, 26, 27, and 28.)

## II.    ANALYSIS

The Fourth Amendment states:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "The text of the Amendment thus expressly imposes two requirements.  First, all searches and seizures must be reasonable.  Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."  *Kentucky v. King*, 563 U.S. 452, 459 (2011).

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003); *U.S. v. Blakeney*, 942 F.2d 1001, 2015 (6th Cir. 1991) (in the context of a motion to suppress, the moving party has the burden of establishing that the evidence was secured by an unlawful search).

### A.  Search of the Vehicle

In his motion to suppress, Brassfield challenges law enforcement's search of the Vehicle. Specifically, he argues that there was no reason to investigate the Vehicle and that the Government

is not entitled to an exception to the Fourth Amendment warrant requirement to search the Vehicle and seize items from it.[7]  (Doc. 44 at PAGEID # 223-24.)

As an initial matter, Brassfield admits that he "was not the owner of the automobile."  (Doc. 44 at PAGEID # 223.)  Additionally, there is no evidence to show that he was an authorized operator who legitimately had possession of the Vehicle.  Therefore, Brassfield has not met his burden in showing that he had a legitimate expectation of privacy in the Vehicle to challenge its search.  *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005) (defendant could not establish that the search of a vehicle violated his Fourth Amendment rights because he had no reasonable expectation of privacy in the vehicle or the items seized from the vehicle given that he had neither a property nor possessory interest in them).

Yet, even if Brassfield was an authorized operator in legitimate possession of the Vehicle, the search of the Vehicle was still lawful.  "The Supreme Court has long recognized an exception to the warrant requirement with respect to searches of vehicles."  *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007).  This is true even when a vehicle is not immediately mobile, and the exception does not have a separate exigency requirement.  *Id*.  "Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime."  *Id*.  (internal quotation marks omitted).  "Probable cause is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion."  *Id*. at 648.  The court's "determination of whether probable cause existed at the time of the search is a commonsense, practical question to be judged from the totality-of-the circumstances."  *Id*.  The court "looks at the subjective facts known to the officers at the time of the search."  *Id*.

---

[7] Brassfield does not address these arguments in his post-hearing brief or reply brief.  (*See* Docs. 74, 79.)  However, the Court will assume that he has not abandoned this argument from his motion to suppress.

"[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *Davis*, 430 F.3d at 352 (internal quotation marks omitted). The requirement of probable cause is satisfied where the facts and circumstances within the officer's knowledge and of which he or she had reasonable trustworthy information are sufficient to demonstrate that an offense has been or is being committed. *Id.* "If the particular officer has probable cause to believe that a traffic offense has occurred, the stop is permissible regardless of whether this was the only basis or merely one basis for the stop." *Id.* (emphasis removed). "Once the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *Id.* at 353.

The Sixth Circuit has found that officers have probable cause to search a vehicle without a search warrant when an officer detects the smell of marijuana coming from a vehicle. *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) (officers had probable cause to search vehicle so, therefore, marijuana, gun, and PCP recovered from the vehicle were admissible against the defendant).

Here, Deputy Snyder had probable cause to approach the Vehicle (at least) based on his observation that the Vehicle did not have a front license plate—a traffic violation. *See* O.R.C. § 4503.21(A)(1) (with exceptions not applicable here, failure to display a license plate on the front of a car violates Ohio's motor vehicle laws). Upon approaching the Vehicle, Deputy Snyder detected the odor of marijuana coming from the Vehicle, which corresponded with his prior belief that the Vehicle's occupant (Jones) was smoking marijuana in the Vehicle. Possessing marijuana (which would include smoking marijuana) is against the law in Ohio. *See* O.R.C. § 2925.11(A),

(C)(3) (possession of less than 100 grams of marijuana is a minor misdemeanor under Ohio law). This, in and of itself, gave Deputy Snyder probable cause to search the Vehicle without a warrant. *Foster*, 376 F.3d at 588. Deputy Snyder also saw what he believed to be a firearm magazine and a knife as he looked into the Vehicle once he approached it. The totality of the circumstances, as set forth above, certainly established probable cause to search the Vehicle. Therefore, the Court denies Brassfield's motion to suppress with respect to the search of the Vehicle and its contents.

## B. Expectation of Privacy in the Camper

In their motions to suppress and briefing, Mullins, Vanwey, and Brassfield generally argue that law enforcement's entry into the Camper (and, in the case of Mullins and Vanwey, law enforcement's subsequent search of the Camper) was unconstitutional. (Doc. 37 at PAGEID # 187; Doc. 44 at PAGEID # 224; Doc. 76 at PAGEID # 670; Doc. 79 at PAGEID # 728-29.) However, an initial question arises regarding whether they had a legitimate expectation of privacy in the Camper. The defendant has the burden of showing that he or she had a legitimate expectation of privacy in the place that was searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

"[T]he Fourth Amendment protects people, not places," so therefore a defendant can "challenge the admission of evidence only if the defendant's own constitutional rights have been violated." *Davis*, 430 F.3d at 359-60 (internal quotation marks and citations omitted). Courts make that determination "by deciding whether a defendant can establish a legitimate expectation of privacy in the area searched or the items seized." *Id.* at 360. *See also Rawlings*, 448 U.S. at 104 (the Supreme Court has abandoned a separate inquiry into a defendant's "standing" to contest an allegedly illegal search in favor of an inquiry that focuses directly on the substance of the defendant's claim that he or she possessed a "legitimate expectation of privacy" in the area searched or invaded place). "To establish such an expectation, the defendant must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively

reasonable." *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009). "An expectation is objectively reasonable only when it is one that society is prepared to recognize as legitimate." *Id.* at 283.

Courts "determine whether a legitimate expectation of privacy exists in a particular place or thing on a case-by-case basis." *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (internal quotation marks omitted). "In making this determination, we consider the person's proprietary or possessory interest in the place to be searched or item to be seized; whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises." *Id.* A person's "home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

"A person may acquire a reasonable expectation of privacy in property in which he has neither ownership nor any other legal interest." *Washington*, 573 F.3d at 283 n.1. For example, simply being an overnight guest in a home is itself enough to show an expectation of privacy in the home. *Id.*, *citing Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990). "In certain cases [the Sixth Circuit] has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence." *Id.* at 283, *citing United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005).

Brassfield concedes that he "does not have standing to challenge the search of the [C]amper." (Doc. 79 at PAGEID # 728; Doc. 44 at PAGEID # 224 ("pursuant to the holding in *Minnesota v. Carter*, 525 U.S. 83" Brassfield appears to lack standing to challenge the search of the Camper because "a temporary houseguest does not have an expectation of privacy, such that he can object to an allegedly unreasonable search").) Regarding Mullins and Vanwey, Mullins' father (and therefore Vanwey's grandfather) owned the property at 5407 Edgewater Drive on which the Camper sat, Deputy Snyder testified that it was apparent someone was living in the Camper, and there was testimony supporting that Mullins and Vanwey were living in the Camper (*see* Doc. 72 at PAGEID # 609-10, 629-31). Additionally, the Camper's door was locked while the deputies were trying to enter it, and Mullins and Vanwey did not open the door or otherwise respond to the deputies' loud, prolonged knocking and announcing.

The Court finds that, based on the evidence presented, Mullins and Vanwey have met their burden of establishing a legitimate expectation of privacy in the Camper. Mullins and Vanwey each possessed a subjective expectation of privacy and that expectation was objectively reasonable. *Washington*, 573 F.3d 279 (defendant had reasonable expectation of privacy in his uncle's apartment, where the defendant was staying while his uncle was in jail); *Waller*, 426 F.3d 838 (holding that a transient person who was never an overnight guest had a reasonable expectation of privacy in a friend's apartment where he showered, changed clothes, and kept some personal possessions). *See also United States v. Schroeder*, 129 F.3d 439 (8th Cir. 1997) (officers violated Fourth Amendment by searching defendant's camper trailer—which defendant used as a residence—without a warrant; defendant had a legitimate expectation of privacy in the camper trailer regardless of who actually owned the land he lived on or how many other people resided on the same property); *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018) ("People—

whether renters, couch surfers, or nomads—have a reasonable expectation of privacy in places that function as home"). The Government does not argue otherwise with respect to Mullins and Vanwey.

### C. Forced Warrantless Entry into Camper

In their motions to suppress, Mullins, Vanwey, and Brassfield challenge law enforcement's forced entry into the Camper.[8] It is undisputed that law enforcement's initial, forced entry into the Camper was without permission and without a warrant. The Government argues that the forced entry was justified under the "exigent circumstances exception" and the "emergency doctrine exception" to the warrant requirement. (Doc. 78 at PAGEID # 725.) In response, the co-defendants argue that the alleged medical emergency was simply "pretext to gaining entry and ultimately securing a warrant to issue for the search of the [C]amper." (Doc. 79 at PAGEID # 729.) In other words, they argue that a frustrated Deputy Snyder subsequently made up an excuse in an attempt to justify an unconstitutional entry and search.

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (internal quotation marks removed). "One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U.S. at 460 (internal quotation marks removed). The Supreme Court "has identified several exigencies that may justify a warrantless search of a home." *Id*. Under the "emergency aid" exigency, "officers may enter a

---

[8] However, as mentioned above, Brassfield concedes that he lacks the necessary legitimate expectation of privacy to challenge the search of the Camper.

home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.*; *Mincey*, 437 U.S. at 392 ("the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. … The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") (internal quotation marks omitted).

In determining whether such an exception to the warrant requirement applies, the Supreme Court has instructed that courts should not use a subjective approach (i.e., we should not look to what the specific law enforcement officer believed), but instead should ask "only whether the circumstances, viewed *objectively*, justify the action." *King*, 563 U.S. at 464 (emphasis in original). Courts consider the "totality of the circumstances" in making the determination. *United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2007). Significantly, the Supreme Court instructed that "[i]t goes without saying that in determining the lawfulness of entry … we may concern ourselves only with what the officers had reason to believe *at the time of their entry*." *Ker v. California*, 374 U.S. 23, 40 n.12 (1963) (emphasis in original).

Additionally, it is the Government's burden to show that the exception applies, and that burden is "heavy." *Goodwin v. City of Painesville*, 781 F.3d 314, 329 (6th Cir. 2015); *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008) ("Qualification for this [emergency aid] exception is not easy, for when there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances," and "[i]n order to establish the applicability of this exception to the Fourth Amendment's requirements, it is the government's burden to prove the existence of exigency.").[9] However, law enforcement does not need "ironclad

---

[9] *Accord*: *Mincey*, 437 U.S. at 393 ("a warrantless search must be strictly circumscribed by the exigencies which justify its initiation").

proof" of a likely serious, life-threatening injury to invoke the emergency aid exception. *Michigan v. Fisher*, 558 U.S. 45, 49 (2009).

Here, perhaps at the time that—according to his testimony—Deputy Snyder first viewed the unresponsive man lying in the fetal position on the Camper's floor the Government may have been able to meet its burden in showing that the "emergency aid exception" justified a warrantless entry. However, as set forth above, that is not the question presented. Instead, viewed objectively, the circumstances did not justify the warrantless forced entry into the Camper <u>at the time that it was finally made</u>. *King*, 563 U.S. at 464; *Ker*, 374 U.S. at 40 n.12.

The evidence set forth above demonstrates a lack of action required to gain entry during the (at least) 25-minute time period between when Deputy Snyder saw the man that he believed had overdosed and the forced entry. Even assuming that it was reasonable to believe that the man was overdosing at the time that Deputy Snyder saw him through the Camper's window, Deputy Snyder's own testimony on direct examination was that the man would need "immediate" aid because he would die or stop breathing within a minute or two. (Doc. 62 at PAGEID # 379-80.) Thus, the man would have died while Officer Synder and the two or three other deputies waited for an ambulance to arrive and decided not to knock on door of the property owner, not to dig into their police vehicle compartments to try to more expeditiously locate a crowbar, not to continuously observe the man through the window to see if he was still lying on the floor, and not to attempt to break through the Camper's door—or a window—with something besides a crowbar during the (at least) 25 minutes prior to the forced entry. *See Purcell*, 526 F.3d at 961-62 (questioning actions of law enforcement during the alleged exigent circumstances and finding that the emergency aid exception to the warrant requirement did not apply).

Given the circumstances, the time to force entry without a warrant in order "to protect an occupant from imminent injury" or "to protect or preserve life" had passed well before the deputies finally entered the Camper. *King*, 563 U.S. at 460; *Mincey*, 437 U.S. at 392. The "emergency aid" exception to the warrant requirement does not apply here.[10] *Id.*; *Purcell*, 526 F.3d at 960 ("Courts that have found that exigent circumstances existed uniformly cite the need for prompt action by government personnel") (internal quotation marks omitted); *United States v. Radka*, 904 F.2d 357, 361-63 (6th Cir. 1990) (reversing district court's denial of motion to suppress, after considering the "totality of the circumstances and the inherent necessities of the situation at the time"). *Compare Atchley*, 474 F.3d at 845 (emergency aid exception applied where officers acted on apparent emergency right away and entered the premises upon perceiving it).

Therefore, law enforcement's forced entry into the Camper without a warrant violated the Fourth Amendment.[11] However, this does not end the Court's inquiries. It must consider whether evidence seized during subsequent searches constitute "fruit of the poisonous tree" or whether there are exceptions to the exclusionary rule under which such evidence is admissible, including the independent source doctrine and the inevitable discovery doctrine (which the Government points to in its brief). *Davis*, 430 F.3d at 358.

---

[10] The Court views the "emergency aid" exception as a subset of the "exigent circumstances" exception. *See King*, 563 U.S. at 460. The "exigent circumstances" exception does not apply because neither the "emergency aid" exception nor the other circumstances within the broader exception apply. *Id.*

[11] Given this determination, the Court finds as moot the co-defendants' argument that law enforcement's "walk around the [Camper] was an unreasonable intrusion and search of the curtilage of the" Camper for which there was no justification. (Doc. 80 at PAGEID # 735.) Of course, it was that walk around the Camper that led to Deputy Snyder (and possibly other deputies) peering into the Camper's windows, viewing the man lying motionless on the floor of the Camper, and, allegedly based on that, the subsequent (unlawful) forced entry into the Camper. However, peering into the windows is the full extent of the co-defendants' objection to the alleged "intrusion and search of the curtilage of the Camper." Also, there is no argument that the deputies saw anything by peering into the windows besides the man (e.g., there is no argument that the deputies saw a weapon that was seized). Therefore, given the Court's decision that the forced entry was unlawful, it need not also evaluate this alternative argument for why the forced entry into the Camper was unlawful.

## D. <u>Subsequent Search of the Camper Pursuant to a Search Warrant</u>

"The exclusionary rule bars the admissibility of items seized during an unconstitutional search, and of testimony concerning knowledge acquired during such a search." *United States v. Leake*, 95 F.3d 409, 411 (6th Cir. 1996) (internal citation and quotation marks omitted). "An offshoot of the rule is the 'fruit of the poisonous tree' doctrine, which bars evidence which, though not obtained in the illegal search, was derived from information or items obtained in the search." *Id.*, *citing Murray v. United States*, 487 U.S. 533, 536-37 (1988). "The doctrine ensures that the government cannot achieve indirectly what it is forbidden to accomplish directly." *Id.*

"At the same time, evidence obtained from an illegal search does not become sacred and inaccessible." *Id.* at 411-12 (internal quotation marks omitted). "So that the government is not put in a *worse* position simply because of some earlier police error or misconduct, the government can show that evidence that might be excluded under the fruit of the poisonous tree doctrine should be admitted under another rationale." *Id.* at 412, *citing Nix v. Williams*, 467 U.S. 431, 433 (1984) (emphasis in original). Two of those rationales are the independent source doctrine and the inevitable discovery doctrine. *Id.*

"Under the independent source doctrine, evidence will be admitted if the government can show it was discovered through sources wholly independent of any constitutional violation." *Id.*, *citing Nix*, 467 U.S. at 442-43. "The doctrine ensures that the government is not penalized for wrongdoing when such wrongdoing would not bear on the outcome of the case." *Id.*

"When there are two searches—an earlier illegal search and a later warrant search— evidence from the later search is from an independent source if the warrant application contains probable cause apart from the tainted information discovered during the first search." *Allen*, 720 F. App'x at 258, *citing United States v. Jenkins*, 396 F.3d 751, 757-58 (6th Cir. 2005). In making the determination, a court must ignore any information—including information in an affidavit

supporting the application for the warrant—from the illegal search.[12]  *Davis*, 430 F.3d at 357-58

("Having determined that the search warrant included illegally obtained information, in this case

the second drug-sniffing dog's positive alert, we must remove this fact from the affidavit when

considering whether there is still sufficient information to establish probable cause to search the

vehicle.").  Thus, "[i]f the application for a warrant contains probable cause apart from the

improper information, then the warrant is lawful and the independent source doctrine applies,

providing that the officers were not prompted to obtain the warrant by what they observed during

the initial entry."  *Jenkins*, 396 F.3d at 758.

"The review of the sufficiency of the evidence supporting probable cause is limited to the

information presented in the four corners of the affidavit."  *United States v. Ray*, 577 F. App'x

526, 531 (6th Cir. 2014); *see also Jenkins*, 396 F.3d at 760 ("A court determining the sufficiency

of an affidavit in support of a search warrant is concerned only with the statements contained

within the affidavit itself," and tainted information must be "eliminated" from consideration).  "In

order to conclude that an affidavit establishes probable cause, the issuing judge must find that

given all the circumstances set forth in the affidavit … there is a fair probability that contraband

or evidence of a crime will be found in a particular place."  *Ray*, 577 F. App'x at 531 (internal

citations and quotation marks omitted).  "To meet the nexus requirement of probable cause, the

circumstances must indicate why evidence of illegal activity will be found in a particular place."

*Id.* (internal citations and quotation marks omitted).  "In other words, the affidavit must suggest

that there is a reasonable cause to believe that the specific things to be searched for and seized are

located on the property to which entry is sought and not merely that the owner of the property is

suspected of a crime."  *Id.* (internal citations and quotation marks omitted).

---

[12] Evidence gathered prior to an illegal search generally is deemed to be discovered by means wholly independent of
any constitutional violation and therefore may be considered.  *Leake*, 95 F.3d at 419.

"Under the inevitable discovery doctrine, evidence may be admitted if the government can show that the evidence inevitably would have been obtained from lawful sources in the absence of the illegal discovery." *Leake*, 95 F.3d at 412, *citing Nix*, 437 U.S. at 444. *See also Murray*, 487 U.S. at 539 ("The inevitable discovery doctrine … is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.") (emphasis removed). "By its nature, the inevitable discovery doctrine requires some degree of speculation as to what the government would have discovered absent the illegal conduct." *Leake*, 95 F.3d at 412. "Speculation, however, must be kept to a minimum; courts must focus on demonstrated historical facts capable of ready verification or impeachment." *Id*. "[T]he inevitable discovery exception applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Id*. (internal quotation marks omitted) (emphasis in original). "The inevitable discovery doctrine requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id*. (internal quotation marks omitted).

"The government bears the burden of proof in establishing the independent source and inevitable discovery doctrines." *Leake*, 95 F.3d at 417. With respect to the inevitable discovery doctrine, "[t]he burden of proof is on the government to establish that the tainted evidence would have been discovered by lawful means." *Id*. at 412. "In evaluating whether evidence should be admitted under either the independent source or the inevitable discovery doctrines, courts should keep in mind the underlying question: 'whether granting establishment of the primary illegality,

the evidence has been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.*, *quoting Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal brackets removed).

Here, after the initial (unlawful) forced entry but on that same day at approximately 3:00 p.m., a state court judge issued a search warrant for the Camper. (*See* Govt. Exh. 11.) The affidavit in support of the search warrant for the Camper was signed by Detective Josh Walters ("Detective Walters"). (*Id.*) The affidavit stated, among other things, that:

> (a) Deputy Snyder observed Jones smoking a marijuana pipe while inside the Vehicle and could smell a strong odor of burnt marijuana;
>
> (b) "[b]ased upon Deputy Snyder's observations, he approached the [V]ehicle and immediately observed a loaded .45 caliber magazine";
>
> (c) "[a]s Jones exited the [V]ehicle, Deputy Snyder observed a Tupperware container containing suspected Methamphetamine sitting on the seat";
>
> (d) "Jones told Deputy Synder [sic] that the gun and Methamphetamine located inside the [V]ehicle belong to him but the rest of the drugs were 'Tony's'";
>
> (e) "[b]ased upon the statement made by Jones, Deputy Synder [sic] approached the [C]amper in an attempt to speak with 'Tony' about the narcotics located inside the [V]ehicle";
>
> (f) upon entering the Camper through forced entry, Deputy Snyder noticed a "sawed off barrel shotgun and drug paraphernalia in plain view";
>
> (g) Mullins told another detective "that there were drugs and weapons inside the [C]amper and in fact she is [a] convicted felon and prohibited from having them"; and
>
> (h) a search through LEADS/NCIC indicated that the Camper was stolen approximately two months earlier.

(*Id.*) The affidavit requested a search warrant for specific items of property concealed in the Camper or upon anyone found within the Camper, including controlled substances, drug paraphernalia, materials used in manufacturing or distributing controlled substances, any property or U.S. currency received from illegal drug sales, and firearms. (*Id.*)

Looking first at whether the independent source doctrine applies to the subsequent entry of the Camper pursuant to the warrant, the Court must eliminate from the affidavit any information that came from the illegal forced entry (the improper information). This includes at least statements (f) and (g) above, both of which specifically connected the Camper with the items of property set forth in the affidavit's request. In other words, those two statements provided a nexus to believe that the specific items of property to be searched for and seized would be located in the Camper. The Court finds that, after eliminating statements from the affidavit that arose from the illegal forced entry, the Government's burden has not been met to show both that the application for the warrant contains probable cause to search the Camper and that the officers were not prompted to obtain the warrant by what they observed during the initial entry. *Jenkins*, 396 F.3d at 758; *see also Davis*, 430 F.3d at 357-58 (finding that information was insufficient to establish probable cause for issuance of a warrant to search defendant's vehicle, following illegal seizure).

Looking next to the inevitable discovery doctrine, the Government does not argue that it applies with respect to the Camper (only with respect to the Vehicle). (*See* Doc. 78 at PAGEID # 724-26.) However, even if the Government had raised it with respect to the Camper, the Government's burden has not been met to show that the evidence obtained in, or derived from, the illegal search of the Camper inevitably would have been obtained from lawful sources in the absence of the initial (unlawful) forced entry. Prior to the forced entry into the Camper, Deputy Snyder wanted to find "Tony." At that time, it was not inevitable that Deputy Synder would have sought and obtained a search warrant for the Camper itself. (Govt. Exh. 11.)

Additionally, warrantless inventory searches of the Vehicle and the Camper do not help the Government on this issue. The inventory search of the Vehicle did not make it inevitable that the Camper would be searched. And, the inventory search of the Camper was based on a

determination that the Camper had been stolen (*see* Govt. Exh. 11), but it is unclear if law enforcement learned the information to make that determination prior to the illegal forced entry.[13] (*See* Doc. 56 at PAGEID # 268-69; Doc. 62 at PAGEID # 404-06.)  It is possible that law enforcement never would have checked whether the Camper was stolen if the illegal forced entry had never happened (and had they therefore never seen what was in the Camper).  Thus, it is not necessarily inevitable that law enforcement would have impounded the Camper and conducted an inventory search in the absence of the illegal entry and search of the Camper.  The Government fails to show otherwise.[14]

Therefore, neither the independent source doctrine nor the inevitable discovery doctrine applies based on the facts of this case and arguments presented.  The Court grants Vanwey's motion to suppress evidence seized from the Camper and Mullins' motion to suppress evidence seized from the Camper.  *Nix*, 467 U.S. at 443 ("The way to ensure [constitutional and statutory] protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes").

### E.  Statements by Mullins and Vanwey

In their motion to suppress, Mullins and Vanwey also move to suppress statements that they made to law enforcement after the forced entry into the Camper.  (Doc. 37 at PAGEID # 187; Doc. 43 at PAGEID # 220-21.)  Specifically, they argue that the statements were (1) derived from an unlawful search and seizure; and (2) absent a knowing and valid waiver of *Miranda* rights.  (*Id.*)

---

[13] Deputy Snyder testified that the Camper was impounded because it was determined to be a stolen vehicle and that, as part of the impound procedure, an inventory of its contents would be conducted.  (Doc. 62 at PAGEID # 410, 483-86.)  The order of statements in the affidavit supporting the search warrant makes it more likely that law enforcement used LEADS/NCIC (to determine whether the Camper was stolen) <u>after</u> the illegal forced entry and because of what law enforcement found in the Camper.  (*See* Govt. Exh. 11.)

[14] The Court notes that Deputy Snyder and Detective Walters both testified that there was no indication Mullins knew that the Camper was stolen.  (*See* Doc. 56 at PAGEID # 282; Doc. 62 at PAGEID # 484.)

The Court finds that, in line with the analysis above, the statements constitute evidence "acquired as an indirect result of the unlawful search" of the Camper, and no exceptions to remove the taint of the unlawful search have been shown to apply. *Murray*, 487 U.S. at 536-37. Therefore, the Court grants Vanwey's motion to suppress the statements that he made to law enforcement after the forced entry into the Camper and Mullins' motion to suppress the statements that she made to law enforcement after the forced entry into the Camper.

### F. Search of Jones' Cell Phone Pursuant to a Search Warrant

In his motion to suppress, Jones argues that the search warrant for his cell phone lacked probable cause. (Doc. 75 at PAGEID # 651.) Detective Raymond Swallen ("Detective Swallen") was on the scene on that same July 28, 2018 day. He prepared a supporting affidavit to obtain a search warrant for Jones' seized cell phone. The sources of the information in the affidavit were: Detective Swallen's discussions with Detective Walters, Deputy Snyder, and Jones.

Based on the affidavit of Detective Swallen, law enforcement obtained a search warrant for Jones' cell phone on July 31, 2018. (Govt. Exh. 12.) The affidavit stated, among other things, that:

(a) a deputy observed Jones smoking a marijuana pipe while inside the Vehicle;

(b) a loaded .45 caliber magazine and plastic container that appeared to have methamphetamine in it were found in the Vehicle;

(c) Jones told a deputy that the gun and methamphetamine located in the Vehicle belonged to him, the driver of the Vehicle was "Tony," the remainder of the drugs from the Vehicle were "Tony's," and "Tony" was located somewhere on the property;

(d) upon entering the Camper through forced entry, Deputy Snyder "observed a sawed-off barrel shotgun and drug paraphernalia in plain view";

(e) Mullins told another detective that there were weapons (including a semi-automatic handgun) and marijuana inside the Camper;

(f) Vanwey told another detective that he "was binging on methamphetamine" that day and had recently been released from prison;

(g) Jones admitted in an interview by Detective Swallen that he had been sitting in the Vehicle waiting for "his friend 'Tony,'" he was smoking some marijuana when a deputy found him in the Vehicle, "he had a small amount of methamphetamine and the Star 45ACP pistol that was found in the" Vehicle, the bag of drugs found in the Vehicle was not his despite it being found at his feet on the passenger side of the Vehicle, "Tony" had driven him to the location "for an unknown reason," he knew that "Tony" sold drugs, he had been staying with Tony at a house in Dayton where he "had observed a pound of methamphetamine," and he (Jones) had a cell phone and his cell phone was located in the Vehicle; and

(h) officers conducted a search of the Camper after receiving a search warrant, and during that search the officers located, among other things, a sawed-off shotgun, a handgun, a revolver, "an estimated 342 grams of a mixture containing white powder and a crystal-like substance" inside of a bag (later shown to contain methamphetamine), and a large amount of U.S. currency.

(*Id.*) The affidavit requested a search warrant for specific information on Jones' cell phone, including information related to sources of drugs, communications between Jones and alleged co-conspirators in the alleged possession and/or trafficking in drugs, information related to transferring of currency, and types, amounts, and prices of drugs bought or sold.

Even after eliminating from the affidavit in support of the search warrant any information obtained from a search of the Camper (e.g., statements (d), (e), (f) and (h) above), the remaining statements in the affidavit provide sufficient facts to show probable cause to issue a search warrant for Jones' cell phone.[15]  Statements (a), (b), (c), and (g) themselves provide such probable cause, and are wholly independent from what was seized, seen, or learned from law enforcement's entry into the Camper.  Those statements suggest that there was reasonable cause to believe that the information to be searched for on the cell phone would be located on the cell phone (i.e., they

---

[15] Jones does not argue that the statements he made to law enforcement should be suppressed.  (*See* Docs. 32 and 75; *supra* footnote 1.)

provide a sufficient nexus to indicate why evidence of illegal activity will be found on the cell phone). *Ray*, 577 F. App'x at 531.

Therefore, the Court denies Jones' motion to suppress. *Allen*, 720 F. App'x at 258 ("When a warrant would have issued without the tainted information, invalidating that warrant would put the police in a worse position than had they not presented the tainted information in the first place."); *Jenkins*, 396 F.3d at 760 (finding that, after eliminating tainted information from the affidavit in support of search warrant, the affidavit still contained a particularized account of facts and circumstances that amounted to a "fair probability" that evidence could be found in the location; thus, "[t]aken by itself, and considering the totality of the circumstances, the affidavit provide[d] sufficient probable cause for the warrant"); *Ray*, 577 F. App'x at 532 (search warrant affidavit contained sufficient facts to support probable cause even absent information from the presumably illegal initial entry).[16]

### G. <u>Arrest of Brassfield</u>

In his motion to suppress, Brassfield challenges his arrest as lacking probable cause. (Doc. 44 at PAGEID # 224-25.) As mentioned above, he concedes that he "does not have standing to challenge the search of the [C]amper." (Doc. 79 at PAGEID # 728; Doc. 44 at PAGEID # 224 ("pursuant to the holding in *Minnesota v. Carter*, 525 U.S. 83" Brassfield appears to lack standing to challenge the search of the Camper because "a temporary houseguest does not have an expectation of privacy, such that he can object to an allegedly unreasonable search").) However, he argues that law enforcement lacked probable cause to arrest him because he "was never observed in the [V]ehicle," he "was never observed committing any criminal acts," and, when he

---

[16] Jones argues that the Government presented no evidence that he carried a "money phone" or "possessed multiple cell phones, one of which would be used for drug dealing." (Doc. 75 at PAGEID # 653.) However, such evidence is not necessary to demonstrate that the affidavit provided sufficient probable cause to issue the search warrant.

was arrested and searched, "he was found to be in possession of currency and the keys to the [V]ehicle[,] not drugs, contraband or anything illegal." (Doc. 44 at PAGEID # 224-25.)

As Brassfield states in his motion, a warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *United States v. McNeal*, 955 F.2d 1067, 1071 (6th Cir. 1992) ("a warrantless arrest must be supported by the existence of probable cause of sufficient weight to support a belief that the individual detained committed a criminal offense"). To determine whether a law enforcement officer had probable cause to arrest an individual, courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Probable cause depends on the totality of the circumstances. *Id.*

The scenario here is similar to the scenario discussed in *McNeal*. In *McNeal*, the Sixth Circuit agreed with the district court's determination that the defendant had no reasonable expectation of privacy in a third-party's apartment where he was found and then arrested. 955 F.2d at 1076, 1079. Although the defendant in *McNeal* therefore was "foreclosed from suppressing the evidence confiscated from his person as the contaminated fruit of the poisonous tree, i.e., an illegal entry and search of [third party's] apartment because he was without an expectation of privacy in her apartment, he was … free to assert his separate personal Fourth Amendment constitutional right to challenge his warrantless arrest … by asserting that the warrantless detention and search of his person while in her premises was without probable cause of sufficient weight to support a belief that he had committed a crime." *Id*. at 1076 (internal quotation marks omitted); *see also United States v. Roche-Martinez*, 467 F.3d 591, 593 (7th Cir. 2006), *citing New York v.*

*Harris*, 495 U.S. 14, 18 (1990) ("unlawful entry into the home of a criminal defendant does not make the defendant's subsequent detention unlawful if probable cause existed to arrest the defendant"). The Court in *McNeal* held that "probable cause for [defendant's] arrest while in [third-party's] apartment must be judged upon the totality of the information available to the government agents when they initially confronted and observed him *after* entering [third-party's] apartment, not *before* gaining entry into those premises." *McNeal*, 955 F.2d at 1075 (emphasis in original). Such information in that case included what the officers had been previously told by an informant and what the officers observed when confronting the defendant. *Id.* at 1076-77.

Here, "the totality of the information available to the government agents when they initially confronted and observed" Brassfield included that: a firearm and large quantity of drugs were found in the Vehicle; Jones told law enforcement that most of the drugs in the Vehicle belonged to the driver of the Vehicle, who was somewhere on the property; and, upon confronting and observing Brassfield, Brassfield's speech was unintelligible.[17] *McNeal*, 955 F.2d at 1075. Given these circumstances, there was probable cause to believe that Brassfield had committed a criminal offense. *Id.* at 1071; *see also United States v. Rolley*, No. 5:17-cr-00007, 2017 U.S. Dist. LEXIS 81186, at *5-6 (W.D. Ky. May 26, 2017) (officer had probable cause to believe defendant was under the influence because, among other things, defendant's speech was slurred). Therefore, the warrantless arrest was reasonable and lawful. *McNeal*, 955 F.2d at 1071. The Court denies Brassfield's motion to suppress.

---

[17] Although not necessary to find sufficient probable cause, Brassfield was also found to be in possession of keys to the Vehicle, an identification card that did not belong to him, and $2,800 in cash.

### III.   <u>CONCLUSION</u>

For the reasons above, the Court **GRANTS** Mullins' motion (Doc. 37), **DENIES** Jones' motions (Docs. 32 and 46), **GRANTS** Vanwey's motions (Docs. 43 and 51), and **DENIES** Brassfield's motion (Doc. 44).

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, August 13, 2019.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE